Case number 23-7141, et al. Samuel Shanks, appellant, v. International Union of Bricklayers and Allied Craft Workers. Ms. Mansbach, amicus guriae for the appellant. Ms. Coleman, amicus guriae in support of the appellant. Ms. Keller for the appellate. Good morning. Mansbach, you may proceed when you're ready. Good morning, and may it please the court, Alexandra Mansbach, court-appointed amicus on behalf of appellants who are here in the courtroom today. I'd like to reserve two minutes for rebuttal. This case concerns a two-tiered COVID vaccine policy that gave most of BAC's black employees only four days to receive their first shot of the vaccine, while most white employees were given 76 days and better information for the same procedure. Combined with the increased level of vaccine hesitancy among black Americans, BAC's policy resulted in black employees being suspended or terminated at a rate seven times higher than white employees. This is more than sufficient to state a plausible claim of disparate impact to survive our motion to dismiss for two main reasons. First, BAC cannot avoid disparate impact liability by claiming that all of its employees had the same opportunity to meet the vaccine requirement, both because employee choice is not part of the causation analysis and because the complaints allege that BAC did not give most of its black employees the same time and resources to comply. Second, even though BAC was not a large employer and therefore the absolute numbers are relatively small here, the facts alleged are nevertheless adequate for a complaint. Whether the outsized impact on black employees was correlated with race or just due to chance is a question for judgment after further factual development. So you've emphasized that there were this two-track policy, but your disparate impact claim would be exactly the same if it were just they announced a vaccination requirement and it happened to disproportionately impact black employees, right? Yes, your honor, but the fact that there was this two-track policy bolsters the claim that there was a disparate impact here. We think that the statistics are sufficient to show that there was a disproportionate impact, but in some cases where the statistics may be insufficient to show statistical significance, courts have looked to other indicia to bolster their confidence that the effect was due to race rather than chance. So if the court thinks that this is insufficient statistics on a motion to dismiss, the other indicia like the two-tiered system can bolster the confidence. I'm not sure I follow the calculation of four days versus 76 days. First the four days, what does that refer to? I mean they announced a policy and I believe it was August having sort of pre-staged it for some months before that and then the requirement didn't come into play until October. Yeah, so what they required was that employees be fully vaccinated by October 4th and full vaccination requires not just multiple doses of the shot, which have to be spaced a certain number of weeks apart, but also time for the body to produce the sufficient antibodies to be considered vaccinated, which takes place after the last shot. So to be fully vaccinated for Moderna with the Moderna vaccine by October 4th, you would have had to have the first shot on August 23rd, which was four days after they announced this policy on August 19th. In terms of the two tracks, I'm not sure that I understood it. The policy announced in, I believe it was June, was anybody who's traveling is going to have to be vaccinated before they travel. Correct. And that would apply, it seems to me, it doesn't necessarily give you 76 days of lead time. Let's say it was June and I were an employee who had travel obligations, those obligations could be one week later, two weeks later, one month later. I could think of an employee who has some travel obligations, but maybe no travel is scheduled for me. So I wouldn't think that I was under a particular deadline. And then some travel obligation arises and whatever the lead time is in advance, once I know that I have a travel obligation, two weeks in advance, a month in advance, four days in advance, I have to scramble. So I don't see this sort of where you get this idea of a unitary, those eligible for versus the rest of the employees. So appellants have alleged that the first work travel was October 2nd. So there was no one who was obligated to travel for work before October 2nd. So there is no case of someone needing to be vaccinated in July and August. Second. And is that, where's that alleged? And was that known in June when that announcement was made? It's alleged that July 71, which is the chart that they break down, they say that the first work travel was October 2nd. It's, I think, the first footnote on that chart. It is possible that some employees may have traveled later, but all of the traveling employees knew in June that they would be subject to this vaccination mandate. And they could begin talking to their healthcare providers, talking to their religious leaders, if they wanted exception, talking to their families, sticking it through. They could begin the process to make this decision. And all the traveling employees were invited to the vaccine hesitancy webinar with the head of the NIH. So they had these additional resources. Where's that alleged? When I looked at that webinar announcement, it seemed like it was directed at a different group of employees. It was directed at the employer council, which is not the same as the travel eligible employees. So on JA45-171 and JA65, appellants allege that all the traveling employees were invited to the webinar and the non-traveling employees were not invited nor told of its existence. But the allegation refers to the document describing that webinar, which I think is on JA62, which is directed at the International Council of Employers. And the framing of this community for event is saying to potential employers of BAC members, here's something that you can learn about when you're employing our people to help them make informed decisions. So I'm not sure that I see any support for the idea that this was aimed in some disparate way or that subset of employees were invited and another subset weren't. So on JA45 and JA171 and JA65, there are allegations that the traveling employees were invited to this webinar. I saw that, but I also thought, and I was pointing to JA45 where it cites, I think it's very documented. It just seems like it's in conflict with it. Well, I believe, I'm not sure exactly the content of the webinar, but the appellants have alleged that this was the webinar and that BAC did invite traveling employees to this webinar and did not invite non-traveling employees. And even later, after this webinar had been recorded, BAC sent this webinar to its members, its bricklayer union members, could have sent it around to all of its employees who were also subject now to the vaccine mandate in August, but they did not do so. And the reason that matters for your theory is what? It matters for two reasons, Your Honor. One is that it helps to bolster the argument for why we would expect that the statistical disparity we see here is caused by race and not caused by chance. Because there were more black employees in the non-traveling we can say, okay, we see this disparity here. 13.5% of black employees were suspended or terminated, but only 2% of white employees. If before we get to summary judgment and we have actual analysis of statistical significance, we can feel confident that, or at least it's plausible that that effect was correlated with race because we know that black employees were given less time and less resources as a whole. So less resources that I wanted you to be more concrete about. So it's the notion that if this webinar had been shared among all staff when it was emailed around to the BAC members, the notion is that that could have addressed vaccine hesitancy. And so it's part of the policy that is causing disparate impact? Your Honor, I think Judge Garcia is correct that we don't necessarily need that to have a plausible case of disparate impact here, but it does bolster the case. It's not just the webinar. It's also the fact that for the June policy, there was slides circulated. There was an all-company meeting. None of those things happened for the August policy. So the non-traveling employees were left with questions about the policy, questions about vaccination, and there was no resources provided to answer those questions, even though BAC had access to those resources through the COVID community core. And the idea is that those resources could have reduced vaccine hesitancy. Yes, Your Honor. But if someone has an underlying medical condition that they think would interact with the vaccine, that's distinct from vaccine hesitancy. Correct, Your Honor. But the non-traveling group also had less time to submit exemption requests. They had about three weeks to submit medical exemption requests, and appellants have alleged that it was very difficult to get medical appointments at this time because of the height of the pandemic, so that they were unable to get medical appointments to get an exemption if they wanted. And it's not just for the exemption. They had less time to... They only had four days to get a medical appointment to speak with their doctor about their concerns of the vaccine, whether or not they were strictly medically related or they were vaccine hesitancy more generally. One of BAC's main arguments on the disparate impact claim is that because there was an element of individual choice, there's a lack of causation. It's not in a genuine sense caused by the policy, but by individual choice. What is your response to that? Courts have recognized disparate impact liability in many cases where there's an element of choice. For instance, the Supreme Court found that disparate impact liability could lie in a case that turned on methadone use, which is also a medical choice within the plaintiff's control. There's dress code cases that also turn on choice. I definitely appreciate all of that. I guess I wonder, just as an analytical matter, at some point, is there a point where the voluntariness comes in, in terms of causation? So if it's really, we're truly either get vaccinated or send us an email opting out. I appreciate that's not the case, but I want to know how to think about the legal frame. And it seems like in some way, that ought to be a defense. And I don't know where that exactly comes into the analysis. Yeah, I think you can't dismiss vaccine hesitancy as just willingness when it's kind of grounded in historical racial trauma and fears about bodily autonomy. I think in some cases, if there's a straightforward, evenly applied, patently justified, with no feasible alternatives, that maybe is enough that can be dismissed at the motion to dismiss stage. But here- But maybe that would be because there's such an obvious business justification, something like that, not for causation. Yes. And the causation inquiry is really looking at whether some specific policy of the employer caused the disparate impact to avoid bottom liability. You can't just say, okay, 80% of your workforce is white and 20% is black. That's a disparate impact claim. You have to point to the actual policy, like refusing to recruit at historically black colleges and university that resulted in that actual outcome. So the root of causation is really to make sure that you're pointing to something specific that the employer has done rather than just the bottom line result. And so what is the policy that is being challenged here? The policy that's being challenged here is the vaccine requirement that everyone be vaccinated by October 4th or submit an exemption by September 13th, about which some employees were told only a few days in advance and some employees were told months in advance. Okay. And is it part of the allegations that in June, the travel eligible employees knew that they weren't traveling until October? That was not how I understood the record. I believe that traveling employees would have known had they had imminent travel coming up, but the fact remains that in practice, they did have at least 76 days to make this decision. And they were still on notice two and a half months before the non-traveling employees that they were going to have to do this. In fact, when someone asked BAC general counsel, hey, are non-traveling employees going to need to be vaccinated? She said, no. She didn't say no. She said, we don't have a plan for that at this time. Is that right? I mean, I just read what's alleged. She said, I believe she said, no, they will not need that. There's three allegations about what exactly that she said. And one of them says that she said, no, you do not have to be vaccinated right now. Of course, that doesn't mean that you have to, that they could have never adopted a vaccination policy for the rest of their employees. It just means that when they did adopt one, it could have been more flexible on timing. They could have, the bargaining unit asked BAC repeatedly if they could extend the exemption deadline and BAC kept moving that meeting until the exemption deadline had passed and then said, no, it's too late. The exemption deadline has passed. And you said you had three sites on the non-traveling employees being assured that they were not. Yes. They're subjected to a vaccine requirement. JA45, JA65, and JA157. All right. Thank you. So the workplace has the following hypothetical and it's brief. An employer requires employees to report to work at a particular time. A group of employees are disciplined after they choose not to adhere to the rule. Maybe citing, I don't know, would that state a claim if the group of employees who choose not to report are disproportionately in a protected class? Would that state a claim? Yes, your honor. That doesn't mean that there's actually Title VII liability here. All that they're saying is that there's a disproportionate impact on some protected class. And if you, the concern with analyzing whether employees are just picking and choosing what to comply with is it's a very difficult line drawing exercise to make a judgment, especially on no record, about what's kind of a freely made choice and which kind of choices interact with societal barriers. So if you had an employer who said, all employees must wear dresses to work, regardless of gender, you can imagine that that would make male employees more uncomfortable and they might be less likely to comply, but that's still a choice. So it's a difficult question of where exactly is the freeness or the easiness of the choice coming in. In grids, the employees could have gotten high school diplomas. They did not, probably because of societal and economic factors that were outside of their control, but it was still a choice. So in the bricklayer's hypothetical, if the late employees challenge the report to work hour, saying we are primary caregivers of kids and it's harder for us to get going in the morning, your report to work time has a, and caregivers are still disproportionately women, so it has a disproportionate adverse impact based on sex. That would be a clear, clearly state a disparate impact claim in your view. Yes, it would. And we'd have to go to discovery and then the employer would be able to proffer a business necessity justification. That's right, Your Honor. I avoid policies that unnecessarily create a headwind for certain minority groups. And at the motion to dismiss stage, you're just looking at the headwind. Did this make it harder in some ways for minority groups? And at later stages of the case, you're looking at, well, was this necessary or not? There might be very good reasons why everyone needs to be at work at 8 a.m. and that could very likely mean that the employer wins, but it doesn't mean that they have not shown that there's some disproportionate impact on women of this role. We've talked so far, at least explicitly, about the disparate impact claim and on the disparate treatment claim. It's obviously one thing to raise concerns about the process and the timing, something entirely different to say they were actually motivated by an intent, even in part, to, I guess, punish single out black employees when there's fairly obvious alternative explanation, which is they wanted all their employees to get vaccinated. And I just wonder, beyond sort of process anomalies, maybe that's all you have, but where's the ingredient that hints that racial animus was underlying this? Yeah, two answers, Your Honor. First, it's not that they implemented a vaccine mandate. We all understand what was going on in the world at the time. It's that they implemented this specific requirement that only gave four days to certain groups that they were completely rigid on the timing, especially knowing the racial composition of the two groups and the background vaccine hesitancy. There's also the entire context here. There's the alleged history of discrimination at BAC, and there's the fact that the goal of the vaccine requirement was for a full-time return to work in October of 2021. At least two years later, they still had not fully returned to work, even though three black employees had been fired for failing to get vaccinated in time for a full-time return to work. I'm not sure I followed. In terms of exposure in the workplace, full-time return to work versus part-time, if you're going to be in an office where other people are also required to be present, just help me out with the distinction between whether you're there three days or five days. Before the October 4th deadline, BAC had a hybrid model of work where some work was remote, some people maybe were in some days, and the reason that they were pushing allegedly the October 4th deadline was because of full-time return to work, but they had not full-time return to work. Also, the fact that they were hybrid meant that remote working was still an option, which could have been an accommodation or at least could have let the non-traveling group have longer to be vaccinated while they did remote work in the meantime, or if they only had to come in the office some days a week, they could have done testing on those days. Testing was an option that the D.C. government used as an exemption in its vaccine mandate, so there were many other things that BAC could have done. And there's no, I take it, your response to the failure of the plaintiffs to make any effort to submit an accommodation request, even incomplete, saying, I need an accommodation. I have, for example, in Mr. Fink's case, I have an underlying medical condition that I'm concerned might be adversely affected by this vaccine. I'm unable to get a medical appointment right now, but I'm diligently trying to do that. There's no evidence that any of the affected employees sought to do that, but your position is that that's not at all required. Correct, Your Honor, and Ms. Lambert had drafted a religious exemption request, but in the past, she had had concerns with a particular employee at BAC, and in the past, when Ms. Lambert had submitted what she thought was essentially evidence and supporting documents to her point of view, this employee at BAC refused to look at them, called her a liar, other issues, so Ms. Lambert was convinced that without, because the same employee was the one reviewing the exemption request, that without a letter from her pastor, which she was unable to get in time, that there was no point, essentially. I don't think she was thinking about preserving her legal rights. She thought that there was no point in submitting this to this person without supporting documentation. Further, what they were supposed to do in grievances with management is go through their own union, the bargaining unit, and the bargaining unit was working really hard to extend the deadline for exemption request or for vaccination, which BAC refused to do both. There's no allegation that the union or that the non-traveling employees were asking for more education or vaccine hesitancy resources. I thought that they were asking for more time and actually were successful in part in getting more time and then an extra grace period, but they weren't really focusing on information in the lead up to this deadline. They didn't know about it. Even the assistant HR manager didn't know that this vaccine webinar was a resource. Also, although there was a grace period, it wasn't announced until October 1st and it only extended two extra weeks, so unless you had already begun the process before October 1st, the grace period wouldn't have helped you. I see I'm over time. No further questions. Thank you. Good morning, your honors. May it please the court, Gail Coleman for the Equal Employment Opportunity Commission. The focus in a disparate impact case is on the effect of an employment policy. The statute describes employment policies or practices that cause a disparate impact on the basis of race. Briggs in the Supreme Court described that as meaning a practice that is fair and form, but discriminatory in operation. Here, Judge Garcia, you asked for the disparate impact claim. Would it make a difference if the employees were challenging it just as a straight vaccine mandate or if they were challenging it with a mandate together with the two-tiered rollout in terms of the causation analysis? And the answer is yes, it does make a difference for causation. Here at page 189 of the joint appendix, Lambert alleged if BAC would have given equal time and resources, the three black employees would not have been terminated. And that is the core of the claim here. So that down the road when it gets into discovery, down the road after the motion to dismiss and they succeed, if it turns out that these individual employees would never have gotten vaccinated, no matter how much time they had, no matter what information about vaccine hesitancy, nothing could have changed their minds, then it wasn't on back of BAC that there was a disparate impact. And BAC would not be held liable for something it hadn't caused. If that were a difference... Why is that? How does that fit with the other... I'm not sure it fits with how plaintiff is presenting. The plaintiff is because the point would be, even in the abstract, if you had a vaccine mandate, nothing else to it, and it turned out 100 black employees didn't comply and were fired, zero white employees did, then wouldn't that state a disparate impact claim? At the motion to dismiss stage, yes, it would. Down the road in discovery, it would make a difference only if... You're only going to hold an employer liable for something an employer is responsible for causing. So if it would have made no difference to any given employee, whether they had more time or whether they had more information than the fact... There was no vaccine mandate. In my hypothetical, that's not the case. If there was no vaccine mandate, the employees... Exactly right. Exactly right. That employee still could state a claim. Here, where the allegation is it was the lack of time and lack of information, causation is a little bit of a different analysis. I'm sorry, I didn't mean to interrupt you. I'm a little... So the accommodation is if you had a medical condition, an underlying medical condition, and you wanted an accommodation because of the potential interaction with the vaccine, and there's no reason to think that the African-American employees were more likely to have those medical conditions, it seems like that's distinct from vaccine hesitancy. I think Ms. Lambert very succinctly expresses a version of vaccine hesitancy when she says, I'm not going to have something put in my body that's been invented within the last year. Do you see that distinction between those two barriers? One is an individual's desire to consult with a doctor because of underlying medical conditions versus a historical and racially correlated mistrust of a medical system that has, as Ms. Lambert points out, the Tuskegee experiments and other situations really failed to equally value and understand the health needs of African-Americans. The focus here should always be on whether the employer is plausibly responsible for a disparity. Again, we are at a motion to dismiss stage. So under Iqbal and Twombly, you were looking only for plausibility and looking at the facts in the light most favorable to the plaintiffs and making all reasonable inferences in their favor. But doing that, looking at the facts in the light most favorable to them, here the allegation is that if Black employees had had more time in which to obtain an appointment with a medical professional to discuss their concerns, they could have timely submitted an exemption request, a medical exemption request. So the element of choice, it's not about did they have a choice and what was the basis of the choice. The question is did the employer interfere with their decision-making process in making that choice? And here the employer allegedly interfered by giving most Black employees less time than most employees, making it harder for them to discuss their health care concerns with a medical professional, making it harder for them to decide whether or not to get vaccinated. So a causation analysis is not about is there something connected to race in the employee's head. The causation analysis is about is there something about the employer's policy that affected the choice. It seems like it's a different aspect of the policy potentially. One might be more time for accommodation, the other might be just more time to learn about the safety of vaccines in general. That's correct. That seems factually. That's correct. So I'm sure the commission has thought a lot, long and hard about the difficult question at the core of this case, which is the summer of 2021, even though the management person said she didn't foresee a need for a general vaccine policy, within a month there was the Delta variant spiking and there were really a lot of morbidity and mortality coming from that. So you're an employer and you want to keep your employees safe. So being pretty loosey-goosey about timing is in conflict with that. I take it your view is, well, that has to go to discovery and summary judgment. The EESC is here because what you rule on this case will not just affect COVID vaccination cases, but will affect disparate impact cases across the board. And here, looking at the Iqbal Twombly standard, there is enough to get passed a motion to dismiss. That does not mean that EAC is ultimately going to lose this Title VII case. After discovery, they may be able to disprove the inference of causation, they may be able to prove a business necessity. They could win. What the EESC's position is, is that right now, right here on a motion to dismiss, these plaintiffs have alleged enough to make it plausible that the employer's policy causes disparate impact because of race. I'm sorry, I couldn't see you sitting here. No, please finish your answer. It's plausible because 30% of the workforce, EAC had 124 employees. 30% of them were black. In the absence of discrimination, one would then expect that 30% of the people who are adversely affected or who are terminated would be black. But as it turns out, 83% of those who were adversely affected were black, and 100% of those who were terminated were black. There are, as you've seen from the briefing, a lot of ways to think about these numbers, and statisticians could come at them in different ways with different tests, looking at different sample sizes and subsample sizes. Statisticians will differ. There are tests that can be run on small sample sizes, and then there's a question about how strong is the inference, how weak is the inference. That is a question for a fact finder, looking at probably competing statistical reports and determining which is more credible and reliable. That's something that the Ninth Circuit just said in Frey's. It's not a question for pro se plaintiffs as they're crafting a complaint. So, from the numbers alone, it is plausible that a statistician could find a statistically significant disparate impact. Could I ask you, counsel, a question? In Iqbal, and that's the standard on which the plaintiffs are relying and you're arguing, do not a lot of our questions this morning go to another aspect of Iqbal. And I don't know how you want to define it, but it does talk about common sense. And as you know, presumably, from cases that have come before the commission, there was a medical crisis at the time in question. And people were dying. Hospitals were overwhelmed. And the vaccine finally comes out. And it's only available to certain groups, normally by age. And an employer, any employer, presumably, wants to protect his employees. It doesn't mean he can force feed them. But as an employer, he has a duty not to cause death or hospitalization of his employees, just turning it around. So, how does the commission deal with that as distinct from a lot of these cases that are cited to us, which arose when the South had signs up that said, you know, whites only, no blacks. So, the environment was a different environment in which a lot of those cases were decided. Now we have a medical emergency. Do you make any distinction in terms of what Iqbal's talking about, in terms of plausibility and common sense? What does the court do with that? Well, the medical emergency certainly is going to be part of the employer's business necessity justification. In disparate impact, the fact that there aren't signs up like there used to be, intent is not an element of a disparate impact claim. I'm not arguing those legal arguments that you and the appellants are making. What I'm just is what does the court do with the language in Iqbal, which certainly talks about plausibility, but the court discusses how you reach that determination. Well, I think that's what a lot of our questions are going to. I understand, I think, Your Honor, and I think that goes back to the causation analysis and where we started, which is what is the claim in this case? And if the claims were challenging just the existence of a vaccine mandate period, I think that gets to exactly what you are speaking to. How could a vaccine mandate not be a business necessity in a climate where people are dying? And that is one thing to think about. This allegation here is more than that. And here the employer is going to have to show as a business necessity, not only people are dying, but it was important for us to do the rollout in this two-tiered way and to be inflexible on the timing and to not give the information to everybody. That is part of what would have to be defended in order for the employer to prevail on business necessity in this case. Do we need, so I have two related questions. Twombly and Iqbal do also invite courts to credit on the pleadings an obvious alternative explanation. How would you guide us to deal with that? Language here. Well, I don't know on the pleadings, Your Honor, that there is an obvious alternative explanation for why when the DAC finally did meet with the union on September 20th or whatever it was, they said, sorry, we can't waive or we will not extend the deadline for seeking an exemption because the deadline has already passed. There's no obvious explanation for why they couldn't have said, fine, take another two weeks. So I do think there are questions here for a fact finder. These are pro se complaints. This is a motion to dismiss. All we're looking for is plausibility. And the fact that a claim is plausible, again, does not mean the plaintiff is necessarily going to prevail. It very well may be in this case, with the COVID mandate, the plaintiff won't, but that is not the question before the court now. So what is the rule that you propose that we adopt? You talk about this having implications for many cases and if you could sort of spell out with some applicability to this case, how you would decide it. As the Supreme Court laid out pretty clearly in inclusive communities, in order to state a claim for disparate impact, a plaintiff has to show that there is a disparate impact, that there is a specific employment policy that they are challenging, and that the disparate impact is plausibly due to that explicit employment policy. That's all. And to you, here, there was some back and forth about this at the outset of the questioning. The specific employment policy is what? The specific employment policy here is the vaccine mandate coupled with its rollout in which the majority of white employees were given more time than the majority of black employees to comply with the policy. And also the majority of white employees were given more information directly combating vaccine hesitancy, even though as a group, the black employees were likely to need that specific information. All of it is tangled up as a package together, as the policy that's being challenged. And how would you articulate exactly what the causation question is? Because a very simple version of it would be, there was a mandate and the causation question is just, were the employees fired because of that mandate? No. Or because of something else? Because the policy here is more than just the mandate. It incorporates the rollout. The causation question here would be, did this two-tiered rollout plausibly cause the disparate impact that we are seeing between black employees and white employees in the compliance rate? Is it plausible? And why is it not just fired because of the mandate? Because the policy being challenged is broader than that. And in the statute itself, section 2000, I think it's E2K, talks about employment policies or practices that are all tangled up together. They're so intertwined that you have to look at the thing as a whole. And that's what this court did in Davis. You do have to look at all of it. Which is why I said, if it were a different case, if we were only looking at there is a policy and now these people are fired and why, there's the causation analysis, they were fired because there's a policy. But in this case, we're saying there's a policy and it, in practice, applied to the difference in what we saw with compliance rates. It just seems a little odd that the fact that they have more factual allegations about a more specific oddities in the process makes their causation showing. On your telling, it makes the causation burden harder. It makes the causation burden harder, but then on the other end, it's going to make business necessity harder for BAC. Because if in fact it was the two-tiered to cause the disparate impacts, then that is the piece that BAC is going to have to defend. Another question is, in terms of, these are pro se plaintiffs and I, although they've had able amicus and the amicus from the commission, I assume they'll be on their own again. And were the case to be remanded, is there a streamlined way that a trial court and also the employer, as you've intimated, could very well prevail ultimately? Could the business necessity be served up through a motion on the pleading, some kind of answer, and then considering that? I don't know the answer to that. Certainly there could be some re-judgment on it. I'm sorry, I just don't know. Following some discovery, presumably. Judge Rodgers, any further questions? No, but I think part of your response might have been, it's not only the mandate and the rollout, but in addition to ICFL, at the motion to dismiss, this court, or any court, must look at the allegations in the light most favorable to the plaintiff. Exactly. That's exactly right. All right. Thank you very much. Thank you for the amicus participation. We'll hear now from the bricklayers, represented by Ms. Keller. Good morning. May it please the court? My name is Kathleen Keller and I'm here representing the Appellant Defendant, the International Union of Bricklayers and Allied Craft Workers. The judges in the questioning this morning have identified some interesting and difficult questions around the margins of the disparate impact doctrine, but I'd submit that this case is not the appropriate case to try to delineate where the lines are on some of these difficult disparate impact questions, and that's because the plaintiff's claim here does not meet the standard under any light, and even reading the plaintiff's pleadings in the light most generous to them. The number of employees they claim to be affected here is not large enough to show the significant statistical disparity that's necessary for disparate impact claims, nor is the differential impact between the races significant enough to state a claim. Disparate impact, as the EEOC counsel stressed, it's different from disparate treatment claims because there's no need for the plaintiff to show any sort of discriminatory intent or animus. As a result, the courts have always held these claims to a higher standard and held that the effect on the affected group must be so stark as to equate to discriminatory intent. The statistics pled must be of a kind and degree sufficient to show that the practice in question has caused the exclusion of the employees because of their membership in the protected group, and the Supreme Court has stressed that it's not appropriate to hold a defendant liable for unintentional discrimination on the basis of less evidence is required to prove intentional discrimination. So let's turn and look at the numbers here. The Brooklayers on the pleadings here had about 124 employees at the time. When you refer to the Supreme Court's statement about unfair to hold on the basis of less evidence, which case are you citing? That's the Watson case, Your Honor. Of the approximately 124 employees that the Brooklayers had at the time, 37 were black and approximately 52 were white. That's on the plaintiff's pleading. And over 90% of the black employees, 34 out of those 37, complied with the policy and were not terminated due to the policy. So we have an over 90% compliance rate and over 90% pass rate compared to, on their pleadings, 100% of the white employees. So again, looking back to the Watson test here, we're looking to see whether those are statistics of a kind and degree sufficient to show that the practice in question has caused the exclusion of the applicants because of their membership in a protected group. And here we have a very small differential, over 90% to 100%. And a small differential like that is particularly problematic where you have a small sample size. Because where the sample size is small, differences are much more likely to result from things like personal choice, random effect, or other variables rather than be caused by the protected characteristic, which is here, race. I want to turn to the question which has occupied most of the questioning and the argument this morning, which is about whether the process by which the policy was adopted has a disparate impact. And the Amici have characterized this as a sort of two tiered rollout, which I think is a mischaracterization of the record. And also the wrong way to think about this case. The focus, I think, has been on the rollout, on the notion that in June there was this announcement that if you're going to be traveling, we'll need you to be vaccinated before you travel. And then in August, they made the announcement that all employees would need to be vaccinated. And I think the focus has been there largely because Amici have realized that the policy itself, that 90% of black employees were able to comply with, does not itself suffice to state a disparate impact claim. But even looking at what they characterize as a two tiered rollout, that doesn't change the ultimate statistics that they've pledged here. You still have a situation in which over 90% of black employees were able to comply. And the timing is really, I think, a red herring. One way to look at it is 90% were able to comply. And they would say the way to look at it is 100% of the employees fired were black. And that's a question I assume that would be resolved by statistical experts. And it seems like a small sample size to me, I'm not an expert. And it just seems like the kind of question that would be resolved at summary judgment. How do we know that your way is the right way of looking at it? And how do we know that three versus zero is too small? And I think that gets back to what Judge Rogers alluded to with the Cromwell-Igby standard, asking the courts apply common sense and judicial experience. And here where you have such a small number, three out of 37, three out of 124 employees, then it's appropriate to look at what we call the pass rate versus the rejection rate. You could have a policy where two men were terminated and one woman. And somebody could say, oh, well, twice as many men were terminated under this policy compared to women. But the numbers are so small that applying typical judicial common sense, you can see that that argument is not of the type and degree that would cause a plausible inference of discriminatory effect. And I posit that the numbers here are similar, where you have only three out of 37 black employees that were unable to comply with policy. I want to also focus on this timing issue. And Judge Pollard had the question about how do they get to the four days? You know, there's a couple different ways you can crunch the calendar on that. But essentially, they had, if they were going to get the Pfizer shot, which was the only one with general approval in August of 2021, that would have been 11 days after the policy was rolled out in order to get the first shot. And then with the two-week negotiated extension, that would have been pushed to 25 days. But significantly, in the plaintiff's pleadings, neither plaintiff has pled that they requested more time, that they raised an issue that they needed more time. What they have pled is that the bargaining unit met with the bricklayers and said, look, there are a couple employees that do need a little bit more time. And so the bricklayers with the staff union negotiated a two-week extension. So there were a couple people for whom the timing was maybe an issue. And so that was resolved in the negotiations between the bricklayer and the affected by the policy, meaning terminated by the policy, such as the plaintiffs here, for whom the timing was the real issue. And they have not pled anything that would plausibly suggest that it was the timing of the rollout that caused the issue here. About Ms. Lambert's, as I understand it, had an allegation about consulting with her pastor and didn't think she had enough time. And the policy itself, if you look at the words of the policy, it says September 13th for accommodation requests absent extenuating circumstances. And certainly, within the words of the face of the policy, it says extenuating circumstances. So if someone had come and said, I really would like to speak with my pastor, but he's been on vacation and I haven't been able to reach him or her, could I have more time in order to do so? That would certainly have been extenuating circumstances. But there's absolutely no pleading that suggests that either of the plaintiffs did anything like that. Where's the quotation to extenuating circumstances? I know it's in your brief. It's in the policy itself, which is JA 9. Any such request should be submitted as soon as possible and absent extenuating circumstances no later than September 13th. So at the pleading stage, your analysis is that the allegations regarding the attempts by their representatives to get meetings, or to get a meeting with a representative of the employer about an extension, that we must view that as not encompassing the plaintiffs themselves as needing an extension, even though we have at least one plaintiff who had something in writing and was thinking about it, but thought that she would be turned down if her request was submitted to a particular employee of the employer. What was pledged is that the staff union attempted to get a meeting before the September 13th deadline and there were scheduling issues. But it's also pledged that the staff union did, in fact, in that second half of September, meet with the bricklayers, and at that point, raised certain particular unnamed individuals who were having some issues with the timing. And that is the point at which the two-week grace period was negotiated, specifically to account for those people who had been brought to the attention of the bricklayers by the staff union. I appreciate that. My question is, viewing the allegations most favorably to the plaintiffs, why is your analysis consistent with that? Well, I'm operating on their pleadings and their allegations. And you're probably more familiar than I. I just want to be clear about this. I understood it. They were trying to get a meeting and had the meeting not been postponed several times, the meeting would have occurred before September 13th. Is that not correct? That is what they've pledged, Your Honor. What they have not pledged is that at any point when they did have the meeting, that the staff union raised issues about Mr. Shanks or Ms. Lambert having timing issues. They've pledged that the staff union raised issues about other individuals who specifically were trying to comply, wanted to comply, but needed some additional time. And a solution was negotiated for those individuals. But they have never pledged that the staff union raised issues about their issues with the timing or attempts to comply. Nor have they pledged that they specifically went individually to the HR department or to anyone else at the bricklayers to say, hey, look, we're trying to do this. We're trying to figure out what our religious situation is or our medical situation. And we just need a little bit more time. There's no allegation that they did that. So the timing, I think it's really even taking their pleadings in the light most favorable to them and incorporating everything they've said in their briefs into their pleadings. It's plain that it did not make a difference for these two plaintiffs at least. Well, one view would be that it would suffice if they had adequately pledged that they would have may have gotten vaccinated if they had more time. It sounds like you're saying they also need to show that they came to the company and told them that. What's the basis for requiring that second showing? Or do you agree that if it was crystal clear, if I had had another month like the traveling employees, I would have at least had more time and likely would have gotten vaccinated, but I wasn't given that chance. They're claiming that a specific policy and process had a disparate impact and where they failed to plead that these issues were raised in such a way the bricklayers could, that it could affect the process. I think that's fatal for their process argument at least. I wondered about two things that seem pretty critical to the plaintiffs as they frame the case. And the one is the webinar, the vaccine hesitancy webinar, and the other is the greater lead time. And on the webinar, I guess I sort of have two related questions. One is whether it was, maybe this is a question of how we read the pleadings and here the district court read the pleadings with a lot of, you know, very much in favor of the plaintiffs, but the council of employers was the target. Is it also the case that the travel eligible employees are part of that group or were actually part of the audience for that? And how do we sort of, how do we read through that question is one. And then the other is the question about travel and when it was announced in June, did everybody know that that was talking about travel only in October? Yeah. Let me take those each in turn. So if you look at, and your questions earlier this morning, I think circled in on this. If you look at the face of the document announcing that webinar with Dr. Collins, it's clear that this is an industry sponsored event to ICE, the International Council of Employers of Bricklayers. And the intended audience of that is the individuals who negotiate the contracts that protect bricklayers working on projects throughout North America. It specifically is, you know, inviting local unions, contractors, people who are involved in negotiating those terms and conditions for bricklayers. And if you think about, you know, what the bricklayers is and what it does, it has people throughout the country that are servicing those contracts and providing support for those local unions and those members that are working on masonry projects across the country and across North America, in fact. And on the facts pledged, there's 14 field employees, for instance, that are included in that 124 employees who are spread out throughout the country working on those issues. So it's plain from the face of the document that that's who the audience is, and that's who would have been invited to the webinar. And I guess I'm just confused why do we care so much about the face of the document? It's totally consistent to say there was a document that went out and invited one bucket, and BAC separately also invited all the traveling employees, but not the other employees. Well, it makes sense from the face of the document that one would invite the employees that are working on those issues with the industry construction employers. And I think the fact that the plaintiffs have relied so heavily on this one webinar that was essentially designed for the bricklayer's sort of customer base, the members, the local unions, the people that are out there negotiating, along with its counterpart within the industry, the fact that they've relied so heavily on this is sort of an indication of the weakness of their case. The idea that an employer who does something to sort of educate its customer base about something, the fact that they did not invite 100% of their staff to sit in on a meeting like that, that itself cannot be evidence. The ultimate allegation is that they invited or shared it with every single person they could imagine, other than the group of mostly black employees, right? Membership that went out and recorded, went out to membership. And this is also just one many, many allegations. I guess one other important one I wanted to ask about is the assertion that this was, you've got a very short timeline and the message is we've got to get this done by October 4th. And then at least the allegation seems to be, but nothing changed. You're on hybrid work, you continue to be on hybrid work. Maybe at some re-judgment, you can come in and say, well, actually there was some other change after October 4th. But if the allegation is stated need is returning to full work on October 4th, and then that doesn't happen, isn't that the type of evidence you typically look for as at least a hint of pretext? I think that argument might go to the business necessity, and I don't think we get there yet. But I also think that, again, applying common sense and judicial experience, much of the country for office workers has been on hybrid work for a period of some years now. And that doesn't mean that safety precautions for people that are working in the office aren't necessary. This policy was applied specifically to people that would be working in the office. And the fact that they may be working hybrid one day a week at home or two days a week at home, I don't think undercuts that. But I think that really gets to the business necessity, which is, you know, I don't believe we're there yet. But it does perhaps put a finer point on why it's important and why the case law over 50 years of this jurisprudence has stressed that you don't get to that business necessity inquiry and the inquiry about whether there were alternative steps an employer could take unless the plaintiff has pled a statistical disparity that is stark enough to suggest a plausible inference of discrimination. And I don't think that's been done here. There was one thing on the travel that I did want to... Before you do that, you did lead with a small number of employees, and I don't think we have a case in our circuit about a small number of employees being problematic in terms of showing disparate impact. Am I right about that? That's right. I was somewhat surprised over, you know, the more than five decades of disparate interest doctrine, there's very, very few cases that involve small numbers of employees. And the cases where you have small numbers like that that have gone forward, there's usually some external factor, like, for instance, there's the Domino's Pizza case, Pizzico out of the Eighth Circuit, where you had a small number of black applicants to the position, but that's because the position required a clean-shaven face. And there were statistics pled that between 25 to 50% of black males would be filtered out by a requirement of that sort, whereas less than 1% of white males would be filtered out by a requirement of that sort. So, you can have a situation where there are numbers and still state a claim where there is some sort of allegations of a larger statistical impact. Certainly, if you had an employer that had a small number of positions that it was hiring for, but said that you had to be 5'10 to apply for it, that would, you know, on its face weed out the majority of women, and it's claimed to be stated there. I think that leads into the questions that the court had about vaccine hesitancy. And one thing that I want to stress here is that while the plaintiffs had pled a generalized vaccine hesitancy related to historical discrimination against African Americans in the medical field, what we're talking about here is not, writ large, a vaccine mandate, but we're talking about a requirement for a specific vaccination at a specific moment in time. And what they have not pled is specifically within that time period. So, August, September of 2021, and specifically with respect to this vaccination, the COVID-19 vaccination in its applicable labor that there is a statistical, a significant statistical disparity in access to that vaccination. I mean, I think if we were talking about February of 2021, it might be a different case, given that there were early on disparities in how vaccine access was playing out, but we're talking about August and September of 2021. I didn't want to lose track. I had asked you a earlier, and I know I've stacked them, but the question about the announcement for traveling employees to get vaccinated, when I first read that, I had thought that was not really effectively setting a single deadline because people's need for travel might vary. In fact, some of those people might face a much shorter deadline than the staff when the general vaccine mandate came in. Some might effectively have longer. Did the bricklayers management know on June 7th that the first meeting requiring work travel would be in October? I'm glad your honor asked that, because I think the briefs are somewhat misrepresent the facts as pled here. I'm looking at JA-71, and what's pled is the first DAC meeting that required travel was held in Chicago during the weekend of October 1st, 2021. If you look also at JA-17, it makes clear that the meeting that's being referenced is the executive council meeting of the bricklayers in October of that weekend, but there's no allegation that no one was traveling beforehand, and there's also no allegation as to whether these quote unquote traveling employees were required to go to the council meeting that weekend of October. So I think it could flip both ways, that there could be, and particularly given this is an international organization, they have 14 field employees that are out there working outside of DC, and they have contracts that they're servicing across the across North America. So it's certainly plausible to think that there are individuals in that supposed traveling employees category who are going to be traveling, who would like to be and there may be people in that quote unquote traveling employees category who had no intention of traveling even to that October executive council meeting, because that wouldn't have been either something they wanted to do or something that they were required to do. And the pleadings on that are really sparse. All it is, the only allegation is that the first bricklayer sponsored meeting that would have required travel outside of DC was that Chicago executive council meeting on October 1st. So as your honor notes, I mean, certainly there could have been people in that traveling category that had much less time, because they would have wanted to travel perhaps in July, and they would have had to run out immediately to get the vaccine if they weren't already in process to get it. Is there any, I don't think this is in the record, but one thing that the plaintiffs point out, I mean, everyone who was in the office throughout this period had to wear a mask. And one of the things that the plaintiffs were asking for is, look, when we're struggling to get documentation of a religious or a medical, you know, confer with a doctor who's going to tell us we do or don't have basis for an accommodation, why can't we do tests and masks? And is there anything in the record in response to that? Why couldn't they do tests and masks? There's nothing in the record that responds to that. And I think, again, this gets to the business necessity and whether there were alternatives, and the question of whether during the height of a delta surge, a weekly testing option would have been sufficient to provide protection to employees. I do think that these vaccine cases are a little different from many other cases, because it is not just about the personal choice that these plaintiffs made, but also about the safety for the other employees in the office. So the 34 Black employees who did choose to comply with the policy and get vaccinated in order to come into work safely, the 121 employees in the precarious generally that complied with the policy so that they could come into work in as safe a way as possible. What's your, as a litigator, understanding of if you did, if we were to remand this claim, what would you advise a judge to do to focus it efficiently? You know, again, we have, per se, plaintiffs and an employer that obviously doesn't want to spend a lot, a lot of time. What would you ask the judge to do in terms of structuring the disposition towards summary judgment? Well, I think it depends on the motion on the pleadings or not. Would there have to be some kind of... It would, of course, depend on what this court would say on a remand and what would of the claims. I think at a minimum, we would need a replied complaint so that we even know what we're responding to because at the moment, the complaint doesn't even contain the outlines of what their argument eventually turned into. But I do think it gets back to some of the difficult questions that were posited earlier about where the lines are with the end point, the rational end point for disparate impact. So, it cannot be, I would submit, that anytime you have three employees who share a single demographic characteristic who decide that they aren't going to do something that their employer has asked them to do, that that itself makes a disparate impact claim. You can imagine an employer that requires everyone to attend sexual harassment training. And if you had three men that said, we don't want to attend sexual harassment training, that makes us uncomfortable and we will not do it. Does the mere fact that it is three men who have been disciplined for refusing to do that state a disparate impact claim? I think the answer clearly has to be no. But somewhere between the test that the AMACI has posited and that test is the line. As I said at the outset, I don't think this case is a good vehicle for this court to figure out where that line is. It's a challenging question, I think, for the future of disparate impact. There clearly is a line someplace. But given the very sparse allegations here and the fact that there clearly was not a significant disparate impact on the black employees, more than 90% were able to do so and, in fact, may have been happy to do so. But I don't think this is the case for the court to test those limits. You just mentioned a case and I couldn't catch the name. Is this the reference to the Pizzico case that you mentioned earlier? Yes. That was just an example of a case. I think it's from the Eighth Circuit. You said it's from the Eighth Circuit. Yeah. Okay. Just wanted to be sure I knew which case you referred to. All right. Anything else? Judge Rogers? All right. Thank you. Thank you, Your Honor. All right. We'll give you two minutes if you want it. Okay. So the first thing that I'd like to address briefly is just the statistics. Eyeballing it and using intuition is just not enough to determine whether there is a statistically significant impact. In Jones, which is the First Circuit case involving hair used for a drug test, there was a false positive rate for black test takers of 1 percent and a 0.2 false positive rate for white test takers. So that means, looking at it the way that BAC has, it was 99 percent versus 99.8 percent. But the court still found that there was statistical significance there because it was on summary judgment and there was expert evidence to analyze those numbers based on all the other statistics in the case and said there is statistical significance here. That's why all of the cases that BAC cites regarding small sample size, they're all on summary judgment or bench trial because it requires looking really carefully at the statistics because there's so many different ways to look at the same numbers in a case. Also, courts can bolster the statistical significance, especially in really small sample sizes, with other indicia that there may be a disparate impact on a particular group. So, for instance, in Frade, which was about university professors' raises, the court looked at the statistics and also said, look, there are reasons here why we expect that female professors are going to be less likely to seek outside offers and therefore less likely to enter into retention raise negotiations. We have that indicia here why we can expect that these statistics create a disparate impact. Second, even if there was just one policy and everyone had the same amount of time, if there was a disproportionate impact, that would be enough to state a claim. Disproportionate impact looks at whether there was an unnecessary headwind against a minority group and the necessity part is the business justification and available alternatives that's looked at later. The headwind part for the motion to dismiss... One question though, on the do you dispute, right, that's what you just described is not this case. Seems as though the theory is that the policy is the vaccine mandate on an accelerated timeline. You dispute that that then changes the causation. They have to plead that all three of those fired employees, at least plausibly, would have been vaccinated if they had more time. I think not, your honor, because even if this case just had the one requirement everyone had the same amount of time, but they had pledged this effect, you know, the seven percent difference, I mean, seven fold difference in rates of effect, that would be enough. The fact, like, if more people are... Seems like very, it just seems hard in this case, but it's very important what the theory of the policy is because unless you disagree with the EEOC it just completely changes what the causation showing is and importantly what the business necessity showing is. Our position is that either way appellants have stated a claim here. If you think that the policy is simply a vaccine mandate, they've still shown that this policy caused a disproportionate impact the same way that a ban on renting to people with criminal convictions would cause a disproportionate impact on some races, thus the Supreme Court has explained, or the Griggs policy. The policy caused a disproportionate impact. If you want to look more specifically at this specific timing aspect of the policy, I think that bolsters the case that, hey, we know that even if you think there's some element of choice that came into play here that makes this policy weird, well, black employees did not face the same choice that white employees faced. More, most black employees had a harder choice in terms of compliance and that's kind of where the timing comes in, but I think we don't need that. Either way, it's a plausible claim. Say if it's just the vaccination requirements, that's the only policy at issue. Why is it that black employees faced a harder choice? You mean if everybody got this at the exact same time? Yeah. Even if that was the case, they still faced a harder choice because of the background vaccine hesitancy that's been played. What if, I mean, is it wrong to read the causation, so there are three employees that were fired, one of them is not a party here, but both that other employee and Mr. Shanks, wasn't really vaccine hesitancy, it was I have an underlying medical condition, so then that leaves only Ms. Lambert who said things just developed, you've got to be kidding, and so you really have one person who's, the reason that she's not able to get the vaccine in time is because of vaccine hesitancy with the other two. It's much more personal specific. So Mr. Shanks alleged that he had medical concerns and that he had vaccine hesitancy, he alleged both of those things, and there are also, there were three people that were fired, but there were five people, there were six people actually, who were suspended or terminated overall, and we don't know what happened to those other people. Also, what we look at here is whether this policy had a disparate impact on a group. We don't necessarily, it could be that the white employee who was suspended maybe also had vaccine hesitancy. That's not what we're looking at. We're looking at did this policy create a headwind for a certain minority group? If you think of the example of men wearing dresses, required to wear dresses to work, and maybe that some men are totally fine with it, doesn't make them uncomfortable, but it still means that as a whole, it would have been harder for men to comply with that rule. Thank you, Nakisha, very much.
judges: Pillard; Garcia; Rogers